UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

LAUREN HOLDEN, individually and
on behalf of all others similarly situated,

                              Case No. 3:21-cv-000279-BJD-JRK

     Plaintiff,

v.

NORTONLIFELOCK INC.,

     Defendant.

_____/

## DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

Pursuant to Rule 12(c), defendant NortonLifeLock Inc. ("NLL") moves for dismissal of the Class Action Complaint ("Complaint") filed by Plaintiff, Lauren Holden ("Holden").

Holden's suit seeks to transform the ordinary use of common commercial website analytics tools called "session replay" into criminal behavior by misapplying a wiretapping statute enacted for a different purpose. "Session replay" generally describes an analytics tool that tracks a user's movements and clicks solely while on that website to improve the visitor's experiences and interactions. Holden's goal in this action and in three other identical class actions she filed against other companies,[1] is to recover millions in statutory penalties on behalf of herself and a class that could never be certified. Significantly, the session replay tool has been used by website operators for

many years, but has **never** been found to violate any state or federal wiretapping statute, including the Florida Security of Communications Act, Fla. Stat. § 934.01, *et seq.* ("FSCA") at issue here. Holden is trying to jam a square peg into a round hole, as the use of session replay is outside FSCA's scope, defined terms, and intended purpose as a matter of law.

Holden claims NLL's use of session replay technology on us.norton.com (the "Website") constituted an invasion of her privacy and FSCA violation. Enacted in 1969, FSCA is aimed at prohibiting the improper recordings of oral or wire[2] communications used in furtherance of criminal activity. Fla. Stat. § 934.01. It is not intended to create a cause of action against an internet website operator for using industry standard session replay technology to understand and improve its own site's functionality and user's experience.

Moreover, NLL's Privacy Policy repeatedly disclosed to Holden that it uses "tracking" technologies and its Cookie Banner not only disclosed the use of "tracking" technologies, but also gave Holden the option to globally turn off cookies. Through her use of the Website, Holden affirmatively consented to the Website's Terms of Use including the use of the tracking software.

## I.   MATERIAL ALLEGATIONS IN THE COMPLAINT

Holden alleges she visited the Website approximately twenty times within

---

[1] Including Holden's own four cases, to date Holden's Counsel has filed 40 identical class actions related to alleged use of session replay on business websites in violation of FSCA.

[2] Wire communications were only protected insofar as the contents of the communications could be

one year prior to filing the complaint, with the last visit being in December 2020, and that during "one or more of these visits", NLL used software such as "session replay" to contemporaneously intercept her "use and interaction with the [W]ebsite, including mouse clicks and movements, information inputted by [Holden], **and/or** pages and content viewed by [Holden]."[3] Doc. 6 at ¶¶ 11 and 14 (emphasis added). Holden contends NLL recorded her "location during the visits, as well as the time and dates of each visit." *Id.* She claims she never consented to the "interception of her electronic communications," and Holden avers NLL "did not disclose or seek [her] consent to intercept the communications." *Id.* at ¶¶ 15-17.

Noticeably **missing** from the Complaint are any facts alleging what she actually did on NLL's Website during any of her twenty visits, including how browsing a website constituted a "communication;" what, if any, alleged communications NLL actually intercepted; or what NLL is supposed to have done with any allegedly intercepted communications. Instead, Holden simply provides a boilerplate list of interactions that she may or may not have engaged in and NLL may or may not have intercepted. The court is left to speculate as to what actually occurred, which is insufficient to state a claim.

---

"heard and understood by the human ear. *See* Staff Analysis 88-184 at 1 (attached as Exhibit A).

[3] These alleged actions are referred to collectively as "Website Tracking" throughout this Motion. The list ending with the qualifier "and/or" is the identical language used in each of the class actions where Holden is a plaintiff, as well as the other matching class actions filed by Holden's Counsel. As a result, Holden provides no insight into this crucial allegation to her claim.

## II.   <u>STANDARD OF REVIEW</u>

A motion brought pursuant to Rule 12(c) is designed to dispose of cases "when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." *Horsley v. Rivera*, 292 F.3d 695, 700 (11th Cir. 2002).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007); *see also Smith v. City of Sumiton*, 578 F. App'x 933, 935 n.4 (11th Cir. 2014) ("[F]or purposes of a Rule 12(b)(6) motion to dismiss, we do not have to take as true allegations based merely 'upon information and belief.'").  A complaint cannot rest on "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," and alleging "[t]he mere possibility the defendant acted unlawfully is insufficient to survive" this standard. *See Twombly*, 550 U.S. at 555; *Sinaltrainal v. Coca-Cola*, 578 F.3d 1252, 1261 (11th Cir. 2009).

"[O]n a motion for judgment on the pleadings, documents that are not a part of the pleadings may be considered, as long as they are central to the claim at issue and their authenticity is undisputed." *Perez v. Wells Fargo*, 774 F.3d 1329, 1340, n. 12 (11th Cir. 2014); *see also Horsley* at 1134 (applying the 'incorporation by reference' doctrine to Rule 12(c) motions). "Undisputed in this context means the authenticity of the document is not challenged." *Id.* In addition, this Court can take judicial notice of the contents of historical webpages, including terms of use and

4

privacy policies. *See, e.g., Capua v. Air Europa Lineas Aereas S.A. Inc.*, 20-CV-61438-RAR, 2021 WL 965500 at *2 (S.D. Fla. Mar. 15, 2021); *see also infra* at n. 14.

## III.   SUMMARY OF ARGUMENT

Holden's Complaint fails to allege facts sufficient to state a claim, and instead relies upon labels and conclusions, formulaically reciting the elements of a FSCA claim. Notably, Holden does not allege what information she transmitted to the Website that could have been intercepted. This is fatal to the Complaint because FSCA requires the "contents" of a communication - the intended substance or meaning of a communication - to be intercepted for a violation to occur. Holden also fails to allege that any communication was intercepted "contemporaneously" with its transmission or that NLL used a "device" to intercept her communications. Without alleging facts demonstrating that any communications were "intercepted" at the same time as transmission rather than at some later point in time, and without alleging that a physical object designed for intercepting communications was utilized to "intercept" her communications, Holden's claim fails.

In addition, Holden seeks to apply FSCA to conduct that would fall outside of its scope. This is because FSCA protects the contents of communications from interception, such as the words spoken on a telephone call. FSCA does not protect against a website provider monitoring non-content record activity on its own website, and no court has ever found otherwise.

Holden's boilerplate allegation consisting of recitation of a list of information that she **may** have transmitted and that NLL **may** have intercepted consists entirely of non-content record activity such as mouse movements.

Even if Holden could overcome these pleading deficiencies, her claim still fails because NLL disclosed that it may track such information, and Holden consented to that tracking. Holden did not have a reasonable expectation of privacy during her visits to NLL's Website to begin with, but the disclosures and Holden's consent eliminate the possibility of suggesting otherwise.

Holden's assertion that Website Tracking falls within the scope of FSCA should be rejected. FSCA is a criminal statute, so the applicable rule of lenity requires the statute to be construed narrowly and in favor of NLL, the defendant.

IV. <u>ARGUMENT</u>

A. **The Complaint Mechanically Repeats FSCA Elements Unsupported by Factual Allegations.**

Holden's Complaint is almost entirely composed of labels, conclusions, and formulaic recitations of elements. For example, in order for an electronic communication to be intercepted, it must be acquired **contemporaneously** with transmission. *See U.S. v. Steiger*, 318 F.3d 1039, 1048–49 (11th Cir. 2003) ("[W]e hold that a contemporaneous interception—i.e., an acquisition during 'flight'—is required to implicate the Wiretap Act with respect to electronic communications.");

*O'Brien v. O'Brien*, 899 So.2d 1133, 1136 (Fla. 5th DCA 2005).[4] Holden makes a single conclusory statement that NLL uses "session replay" technology to "contemporaneously" intercept electronic communications, providing no factual basis for this assertion. Doc. 6 at ¶ 14. Holden also conclusorily contends NLL "violated § 934.03(1)(d) of FSCA by using the unlawfully intercepted electronic communications" *Id.* at ¶ 37, but this is merely a conclusion masquerading as fact that this Court is free to disregard.

Because Holden fails to allege facts that support the legal conclusions and formulaic recitation of elements, the Complaint should be dismissed.

### B.   FSCA was not Designed to Address Website Tracking.

FSCA was enacted in 1969 with legislative findings memorialized in the statute demonstrating that it was enacted to: (1) protect the privacy of wire and oral communications, (2) prevent **organized criminals** from using oral and/or wire communications in their criminal activities, and (3) ensure that any information from such oral and wire communications would not be misused. *See* Fla. Stat. § 934.01. (emphasis added).

FSCA is modelled on and largely tracks the Federal Wiretap Act, 18 USCA § 2501 (1968). As originally enacted, for example, FSCA defined "intercept"

---

[4] *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113 (3d Cir. 2003), as amended (Jan. 20, 2004) ("Every circuit court to have considered the matter has held that an 'intercept' under the [Federal Wiretap Act] must occur contemporaneously with transmission."); *Handley v. Wilson*, 2010 WL 11607357 (S.D. Fla. 2010) ("Fla. Stat. § 934.10 does not provide a cause of action to those whose electronic communications were acquired from electronic storage rather than intercepted during

as the "**aural** acquisition of the contents of any wire or oral communication . . ." Fla. Stat. § 934.01 (1969) (emphasis added), the same definition used in the Federal Wiretap Act. This definition makes clear that FSCA as enacted was limited in purpose, to protect private conversations from being secretly recorded.

The inclusion of "wire communications" was the natural product of seeking to provide telephonic communications (transmitted via wire) with the same privacy protection afforded to in-person oral communications. These conventional forms of communication were all that FSCA and the Federal Wiretap Act were intended to protect.[5] *See* Ex. A at 1.

FSCA was not amended to include "electronic communications" until 1988.[6] *See State v. Jackson*, 650 So.2d 24, 27 (Fla. 1995). Notably, when "electronic communications" was added, the Legislature excluded "[a]ny communication from an electronic or mechanical device which permits the tracking of the movement of a person or an object." Fla. Stat. § 934.02(12)(c); *see also* Ex. A at 2. In addition, communications through 'tone-only' beepers were excluded from protection. Fla. Stat. § 934.02(12)(b); Ex. A at 2. However, voice pagers and digital readout pagers were still protected. Ex. A at 2. "These forms of communications would be excluded

---

[5] *See also* S. Rep. 99-541, 1986 WL 31929 at *2-5 (1986) (explaining that the Federal Wiretap Act "only applie[d] where the contents of a communication **can be overheard and understood by the human ear**") (emphasis added).

[6] In doing so, the Florida Legislature sought to track the Federal Wiretap Act's expansion to include "electronic communications" from two years prior. *See* Ex. A at 2. Development of the World Wide Web did not begin until the following year and was not made generally available until several years later. *See* https://www.britannica.com/topic/World-Wide-Web (last visited March 24, 2021).

contemporaneous transmission").

primarily because of the limited privacy implications related to their use." *Id.* Simply put, FSCA was amended to keep up with changes in communication technology involving the same types of communications, nothing more.[7]

This was clearly explained in connection with the prior corresponding amendment to the Federal Wiretap Act.

> A letter sent by first class mail is afforded a high level of protection against unauthorized opening . . . [and] [v]oice communications transmitted via common carrier are protected . . . [b]ut there are no comparable Federal statutory standard to protect the privacy and security of communications transmitted by new noncommon carrier communications services or new forms of telecommunications and computer technology.

S. Rep. 99-541, 1986 WL 31929 at *2-5 (1986).[8] The intention was to keep up with changes in communication technology so that the substance of communications traditionally protected from eavesdropping and recording would remain protected when delivered through a new medium, not to redefine what types of conduct would be considered communications and entitled to privacy protection. *See generally id.* Mouse movements on a public website are no more protected from monitoring than a person's walking path in a public store.

Holden's broad interpretation of this limited expansion of FSCA bears similarity to an issue the Supreme Court recently decided. *See Facebook v Duguid*, --

---

Moreover, the legislative findings were not updated when "electronic communications" was added to FSCA. *See* Fla. Stat. 934.01.

[7] After the World Wide Web was developed and released, FSCA was amended in 1997, 1999, 2000, 2002, 2010, 2013, and 2015, but none of these amendments expanded the limited scope of FSCA to reach Website Tracking. *See generally* Fla. Stat. § 934.01, *et. seq.*

[8] *See also* 132 Cong. Rec. H4039-01, 1986 WL 776505 (1986) (explaining the amendment was needed to (1) ensure developments in technology do not cause communications to lose their privacy protection; (2) protect the communication itself regardless of the method of delivery; and (3) protect the contents of documents traditionally maintained on paper and protected from search and seizure).

- S.Ct. ---, 2021 WL 1215717 (2021). There, Congress was concerned with preventing certain types of phone calls made using unique telemarketing equipment, but the plaintiff sought to interpret the definition far more expansively, capturing ubiquitous technology such as modern cell phones. *Id.* at *6. The Court explained that "[e]xpanding the definition . . . would take a chainsaw to these nuanced problems when Congress meant to use a scalpel." Here, Holden seeks to extend FSCA to outlaw technology ubiquitous in modern websites that have no relationship to the nuanced issues FSCA (and the Federal Wiretap Act) were designed to address.

Further, despite Website Tracking falling outside the scope of FSCA, and despite the fact that FSCA, the Federal Wiretap Act, and the state analogs in many other states having <u>never</u> been found to apply to session replay technologies, citing to *O'Brien*, 899 So.2d 1133, Holden declares "[s]uch clandestine monitoring and recording of an individual's electronic communication has long been held a violation of FSCA." Doc. 6 at ¶ 2. However, *O'Brien* involved a wife installing spyware on her husband's computer and using it to monitor his private on-line chats with another woman. *Id.* Simply put, *O'Brien* only stands for the proposition that using an electronic medium to transmit communications that would once have been made by letter or orally does not change the sanctity of the communication. *See id.*

In contrast, session replay software simply allows companies to understand a customer's experience on their websites. For example, hundreds of companies use session replay tools to discover and resolve website technical issues that frustrate customers and impact their ability to complete their intended transactions, help

customers with customer service requests, and respond to customer feedback. Session replay thus helps companies identify what works and what doesn't on their websites, and ensure a better user experience for anyone visiting their websites.

Session replay does not record the user. Instead, it uses millisecond-level chunks of data to analytically reconstruct a customer's experience during a visit to a company's website. But the reconstruction is just that — a reconstruction, not a recording. This reconstruction can analytically display "mouse movements, scrolling" and "errors and events" relating to a user's engagement on sites they seek out, revealing items such as a link that does not work or an error code at checkout.

However, session replay does not capture the **contents** of communications as contemplated by FSCA. Rather than being similar to a wiretap and recording private communications, session replay is simply the modern-day equivalent of a sales associate observing a shopper in a public brick-and-mortar retail store.

### C.    Holden Does not Allege that NLL Intercepted the "Contents" of her Electronic Communications.

Holden contends NLL violated FSCA §§ 934.03(1)(a) and (1)(d), but to state a claim, these sections require Holden to allege that NLL **intercepted** her electronic communications and then **used the contents** of those communications. FSCA defines the term "intercept" as "the aural or other acquisition of the **contents** of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. §934.02(3) (emphasis added). "Contents," is defined as "any information concerning the **substance, purport, or meaning of that communication**."

Fla. Stat. §934.02(7) (emphasis added).[9]

The Ninth Circuit's explanation regarding the proper scope of the term "contents" in *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1107 (9th Cir. 2014) guides the result under FSCA.[10] That court analyzed Congress's intent regarding the term contents as used in the Federal Wiretap Act. *Id.* at 1105. The court considered the "ordinary meaning of these terms, including their dictionary definition" and found that "a dictionary in wide circulation during the relevant time frame provides the following definitions: (1) 'substance' means 'the characteristic and essential part,' (2) 'purport' means the meaning conveyed, professed or implied,' and (3) 'meaning' refers to 'the thing one intends to convey by language.'" *Id.* at 1105-06. The court concluded that "Congress intended the word 'contents' to mean a person's intended message to another (i.e. the 'essential part' of the communication, the 'meaning conveyed,' and the 'thing one intends to convey')." *Id.* at 1106. The court further found the "language and design of the statute as a whole" made clear that "the term 'contents' refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication." *Id.*

---

[9] The Federal Wiretap Act defines "intercept" and "contents" identically. *See* 18 U.S.C. § 2510(4) and (8).

[10] *See, e.g. O'Brien*, 899 So.2d at 1135; *Royal Health Care Services, Inc. v. Jefferson-Pilot Life Ins. Co.*, 924 F.2d 215, 219 (11th Cir. 1991) (rejecting argument that "case law dealing with the Federal Wiretap Act is inapposite," in light of identity of language used and historical note to the legislative findings section of FSCA); *Horn v. State*, 298 So. 2d 194, 198 (Fla. 1st DCA 1974) (construing "virtually identical" federal statute); *Stalley v. ADS All. Data Sys., Inc.*, 997 F. Supp. 2d 1259, 1270 (M.D. Fla. 2014), *aff'd sub nom. Stalley v. ADS All. Data Sys., Inc.*, 602 Fed. Appx. 732 (11th Cir. 2015) (analyzing federal cases where parties agreed that "FSCA mirrors the Federal Wiretap Act").

The court then analyzed whether the information at-issue constituted "contents" sufficient to state a claim under the Federal Wiretap Act. *Id.* at 1106–07. There, the plaintiffs clicked on the Zynga game icon within Facebook and the "HTTP request to launch a Zynga game contained a referer header that displayed the user's Facebook ID and the address of the Facebook webpage the user was viewing before clicking on the game icon." Id. at 1102. Those plaintiffs alleged that this referer information was unlawfully intercepted. *Id.* at 1103. Relying on its analysis of the definition of "contents," the court found that the plaintiffs failed to state a claim under the Federal Wiretap Act because the "information disclosed in the referer headers at issue is not the contents of a communication" and affirmed dismissal of the complaint with prejudice. *Id.* at 1109.

Federal courts have uniformly found that non-content record information, such as email addresses, URLs and IP addresses, geolocation data, passwords and user IDs, and other basic identification and address information, are not "contents" of an electronic communication within the Federal Wiretap Act's purview. *Id.* at 1107; *Cousineau v. Microsoft*, 992 F. Supp. 2d 1116, 1127 (W.D. Wash. 2012) (granting motion to dismiss because geolocation data does not constitute "content" under the Federal Wiretap Act); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1062 (N.D. Cal. 2012) ("Thus, the Court concludes that [] personally identifiable information that is automatically generated by the communication but that does not comprise the substance, purport, or meaning of that communication is

not covered by the Wiretap Act.").[11]

Florida state courts follow suit when analyzing FSCA. For instance, the court in *Minotty v. Baudo*, 42 So. 3d 824 (Fla. 4th DCA 2010) relied on federal law to conclude that "silent video surveillance is not covered by [FSCA]" and held that the plaintiffs there "did not prove their cause of action under the act." *Id.* at 832.

Here, Holden never alleges that she entered into the public Website any information or "content", and moving a mouse is not content.[12] Any facts alleged by Holden in this regard merely refer to non-content record activity. *See* Doc. 6 at ¶ 14. The Complaint should therefore be dismissed because Holden has not alleged the interception of the "contents" of any communications.

### D.   NLL Disclosed, and Holden Consented to NLL's Use of Analytics and Website Tracking on the Website.

Through its multiple website disclosures, NLL expressly put Holden on notice of, and she consented to, any monitoring NLL allegedly conducted related to her voluntary use of the Website.[13] *See, e.g., Jackson v. State*, 18 So. 3d 1016, 1030 (Fla.

---

[11] *See also United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008); *United States v. Reed*, 575 F.3d 900, 917 (9th Cir. 2009); *Brodsky v. Apple*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020) ("user names, passwords, and geographic location information" is not "content[]"); *Gonzales v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078, 1086 (N.D. Cal. 2018) ("simply opening a webpage . . . is not a communication with content.").

[12] Moving a mouse on a screen to navigate another's website is no more the "contents" of a communication than the act of driving a car is a communication to others that you are driving a car.

[13] Courts in the Eleventh Circuit consider website terms of use and privacy policies at the motion to dismiss stage where, as here, a plaintiff's claim depends on the language of the privacy policy, even if the policy is not attached to the Complaint. *See, e.g., Githieya v. Glob. Tel*Link*, 2016 WL 304534, at *3 (N.D. Ga. Jan. 25, 2016). Here, Holden alleges that NLL's website "did not disclose" the use of "tracking, recording and/or 'session replay' software," *See* Doc. 6 at ¶¶ 15, 17. Thus NLL's disclosures and terms of use are central to Holden's claim and appropriate for this Court's consideration. *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1054 n. 12 (11th Cir. 2015). This analysis is the same for a motion brought pursuant to Rule 12(c). *See Horsley*, 304 F.3d at 1134.

2009) ("Jackson was aware through repeated, automated warnings that the jail would record and monitor his communication. Thus, Jackson implicitly consented to the interception."). NLL gave Holden the right to opt out immediately upon visiting the Website. *See* Ex. D-1. (the "Cookie Banner"). By selecting "No, take me to settings," the user is then taken to the Privacy Settings with the option to consent or opt out in whole or in part. *See* Ex. D-2. (the Privacy Settings").

In addition, the Terms of Use which are available through a link on every page of the Website begins by stating that "[t]he following terms and conditions, together with any policies incorporated by reference [i.e. the Privacy Policy], govern

---

Copies of the Terms of Use in effect beginning July 21, 2020, Privacy Policy in effect beginning January 1, 2020, and Cookie Banner and  Privacy Settings in effect beginning September 24, 2020 are attached as Exhibits B, C, D-1 and D-2. Each was in effect through the date of Holden's last visit to the Website. In addition, copies of the Terms of Use in effect on February 8, 2020 through July 21, 2020 and the Cookie Banner and Privacy Settings in effect on February 8, 2020 through September 24, 2020 are attached as Exhibits E, F-1 ands F-2. Each of these is relevant because Holden alleges she "most recently visited [the Website] on or about December 2020," and that "[o]ver the past year, [Holden] visited [the Website] approximately 20 times." Doc. 6 at ¶¶ 11-12. The Complaint was filed on February 8, 2021 and therefore the relevant period is February 8, 2020 through February 8, 2021. *See* Doc. 6. The Terms of Use, Cookie Banner, and Privacy Settings in effect during the relevant period are materially the same. Compare Ex. B with Ex. E and Ex. D with Ex. F. The primary difference between the Terms of Use is that the older version used NLL's former name, Symantec Corporation; and the older version of the Cookie Banner contained less text in the pop up itself, and the Privacy Settings had limited formatting differences.

Separately and independently, this Court can consider NLL's Terms of Use and Privacy Policy by taking judicial notice of them. The copies of NLL's Terms of Use and Privacy Policy which were active during the period of time Holden alleges she visited NLL's website were obtained from Internet Archive's Wayback Machine, which maintains archived copies of historical webpages. *See* https://web.archive.org/web/20201130104422/https://www.nortonlifelock.com/us/en/legal/terms-of-use/ and https://web.archive.org/web/20201130103703/https://www.nortonlifelock.com/content/dam/nortonlifelock/pdfs/eulas/privacy-notice/norton-global-privacy-statement-en.pdf (last visited April 6, 2021). The Cookie Banner in effect before September 24, 2020 was obtained from archive.today, another internet archive. *See* https://archive.fo/KT11c/image. Courts in the Eleventh Circuit – as recently as last month – have taken judicial notice of such records. *See, e.g., Capua*, 2021 WL 965500, at *2; *Tobinick v. Novella*, 2015 WL 1526196, at *2 (S.D. Fla. 2015); *Pohl v. MH Sub I, LLC*, 332 F.R.D. 713, 716 (N.D. Fla. 2019) (collecting cases); *Pond Guy, Inc. v. Aquascape Designs, Inc.*, 2014 WL 2863871, at *4 (E.D. Mich. 2014).

your access and use of" the Website, and "[b]y accessing, or using this Website, you

acknowledge that you have read, understand, and agree to be bound by these terms .

. . **If you do not agree to these terms please do not use this Website**." Ex. B at 1

(emphasis added).[14]

Holden does not allege that she chose to opt out of Website Tracking or

disputed the Terms of Use, so therefore she consented to the Website Tracking due

to her continued use of the Website on each of her twenty visits. *See In re Yahoo

Mail Litig.*, 7 F. Supp. 3d 1016, 1031 (N.D. Cal. 2014) (granting motion to dismiss

federal wiretapping claims where users consented to additional terms of service that

put them on notice about scanning and analyzing emails for purposes of providing

personal product features and targeted advertising); *Dohrmann v. Intuit, Inc.*, 823

Fed. Appx. 482, 483-84 (9th Cir. 2020); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d

1171, 1177 (9th Cir. 2014) (a user can be bound by terms and conditions if "the

website puts a reasonably prudent user on inquiry notice" of the same).

The Terms of Use agreed upon by Holden through her voluntary and

continued use of the Website also states under the heading **Confidential Information**

**and Privacy** that:

> With the exception of credit card information . . . NortonLifeLock does not
> want to receive confidential or proprietary information from you through our

---

[14] The Terms of Use in effect in effect during the relevant period prior to July 21, 2020 contained minor differences. *See* Ex. E at 1 ("The following are the terms of an agreement between you and Symantec Corporation ("Symantec"). By accessing, or using this website, you acknowledge that you have read, understand, and agree to be bound by these terms and to comply with all applicable laws and regulations. If you do not agree to these terms, please do not use this website.").

> Website. Other than credit card information, any information or material sent to NortonLifeLock will be deemed NOT CONFIDENTIAL. By sending NortonLifeLock any information or material, you hereby grant [NLL] an unrestricted, irrevocable license to copy, reproduce, publish, upload, post, transmit, distribute, publicly display, perform, modify, create derivative works from, and otherwise freely use, those materials or information. . . . Personally-identifiable information that you submit to NortonLifeLock . . . will be handled in accordance with our privacy policies. Please see the Privacy section on this Website for information regarding NortonLifeLock's privacy policies.

Ex. B at p. 4.[15]

The Website disclosed to Holden that use of the Website would be tracked and her data would be collected unless she opted out of the tracking and collection by way of a conspicuous link to the agreed upon Privacy Policy that is available from the front page of the Website and every sub-page, as well as in the Terms of Use where it is referenced.

For example, the first page of the Privacy Policy explains that it "**describes how we collect, process and share personal data and the choices available to you regarding collection and use of your personal data.**"  This is followed by an outline of the Policy with headings including "**Cookies and tracking technologies**"; "**How we collect personal data**" and "**The categories of personal data we collect**", along with statements such as "**We use cookies and similar tracking technologies on our websites . . .**" Ex. C at pp. 1-5 (emphasis added).

After this introduction and outline, the "Global Privacy Statement" follows. Under the all-capital bolded and underlined heading "**HOW WE COLLECT YOUR**

---

[15] The prior version references Symantec and does not capitalize "website". *See* Ex. E at 2.

**PERSONAL DATA AND FROM WHAT SOURCES**" the following disclosures, among others, are made:

- When you visit and use our websites, products and services, we automatically may collect data about your use of our websites, products and services; When you interact directly with us, we may collect personal data that you provide to us (e.g. account and payment information).

- The categories of personal data that we collect . . . include: . . . device and system information, browser type, IP address, type of operating system, and internet or other electronic network activity information . . . data received directly from you, and/or derived from cookies . . . and third-parties indicating usage and preferences . . .

*Id.* at pp. 6-7.

Then, under the all-capital bolded and underlined heading "**COOKIES & TRACKING TECHNOLOGIES**", the following disclosures are made:

- We and our partners use cookies and other similar **tracking technologies** . . . on our websites or emails to:
  o Ensure the proper functioning of our websites . . .
  o Tailor information presented to you based on your browsing preferences, such as language and geographical region . . .

- We use different kinds of cookies: . . . **Advertising cookies and tracking scripts** are used to make advertising messages more relevant to you. . .

- If you do not wish to receive cookies you may be able to refuse them by not agreeing to the use of them upon entering the website.

*Id.* at pp. 15-16. (emphasis added).

In addition, Holden immediately saw the Cookie Banner upon visiting the Website stating: "[w]e and our partners use cookies on this site to improve the efficiency of the navigation, perform analytics, serve more relevant advertising . . ."

along with options to select "Yes, I agree" or "No, take me to settings." Ex. D-1.[16]

When a user clicks "No, take me to settings" or the "Privacy Settings" tab next to it,

another disclosure appears, explaining "**we might sometimes track information about**

**you . . We use this information for things like experience enrichment, analytics, and**

**targeting advertising.**" Ex. D-2 (emphasis added).

> Analytics: These technologies collect information that is used in aggregate form to help us understand how our websites are being used or to help us continuously improve our websites" and "Performance and Functionality: These technologies are used to enhance the performance and functionality of our websites but are non-essential to their use. . .

*Id*. (emphasis added).

Holden never alleges that she chose to turn off any of the disclosed analytics

tools, nor that she instructed NLL not to track her or collect her data despite these

disclosures and her affirmative consent through her continued use of the Website.

Holden was expressly put on notice of, and agreed to, any tracking or monitoring

related to her use of the Website.

## E.   Holden did not have a reasonable expectation of privacy while visiting the Website.

"Enactment of [FSCA] connotes a policy decision by the Florida legislature to

allow each party to a conversation to have an expectation of privacy from

---

[16] The version of the Cookie Banner in effect through September 24, 2020 contained a similar statement: "We use cookies for personalization, analytics, security and advertising purposes. Learn more." Ex. F-1 at 1. That sentence was followed by a button "OK" which, if clicked, opened a screen that contained the same substance as the more recent Privacy Settings, with minor stylistic differences. Compare Ex. D-2 with Ex. F-2.

interception by another party to the conversation." *O'Brien*, 899 So. 2d at 1135 (citations and quotation marks omitted).

> This expectation of privacy does not contemplate merely a subjective expectation on the part of the person making the uttered oral communication but rather contemplates a reasonable expectation of privacy. A reasonable expectation of privacy under a given set of circumstances depends upon one's actual subjective expectation of privacy as well as whether society is prepared to recognize this expectation as reasonable.

*State v. Inciarrano*, 473 So. 2d 1272, 1275 (Fla. 1985).

There can be no reasonable expectation of privacy upon visiting a website,[17] as explained by the Pennsylvania Superior Court while analyzing that State's substantively identical wiretap statute to FSCA in the context of e-mail and private chat messages:

> This situation is unlike one in which a party is engaging in a conversation over the telephone. While engaging in a conversation over the telephone, a party would have no reason to believe that the other party was taping the conversation. Any reasonably intelligent person, savvy enough to be using the Internet, however, would be aware of the fact that messages are received in a recorded format, by their very nature, and can be downloaded or printed by the party receiving the message. By the very act of sending a communication over the Internet, the party expressly consents to the recording of the message.

*See Commonwealth v. Proetto*, 771 A.2d 823, 829 (Pa. Super. 2001).

In the unusual situations where courts have found an expectation of privacy to exist, the outcome was driven by highly narrow and unusual circumstances. These cases have involved companies affirmatively misleading their visitors about what

---

[17] This holds especially true in the context of a commercial website. Courts across the country, including the Supreme Court, have held that expectations of privacy are considerably lessened in commercial settings. *See, e.g. Minnesota v. Carter*, 525 U.S. 83, 90 (1998) (holding that expectations of privacy in commercial settings are less than similar expectations in private settings); *Cohen Bros., LLC v. ME Corp., S.A.,* 872 So.2d 321, 324 (Fla 3d DCA 2004) ("Society does not recognize an

data will be collected, failing to disclose the collection of highly sensitive data, and tracking users across all website interactions, not just the companies' own websites.

For example, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) involved Facebook tracking users **on third-party websites**,[18] and continuing to do so even **after the users logged out** of Facebook's application, in order to create personal profiles of users that it would then sell to advertisers. *Id.* at 596. However, Facebook "affirmatively stated that logged-out user data would not be collected." *Id.* at 602. Therefore, "Facebook set an expectation that logged-out user data would not be collected, but then collected it anyway." *Id.* Moreover, "the amount of data allegedly collected was significant," and enabled Facebook to "compile[] highly personalized profiles from sensitive browsing histories and habits . . ." *Id.* at 604; *cf. Forrester,* 512 F.3d at 510–11 (holding certain computer surveillance techniques did not amount to a "search" under the Fourth Amendment due to the lack of privacy expectation as to record information related to website visits and e-mails).

The Ninth Circuit also identified two other decisions in which an expectation of privacy was found to exist, and the analysis of these cases highlights one of the key distinctions. *In re Facebook*, 956 F.3d at 603 citing *In re Google Cookie Placement Cons. Priv. Litig.*, 806 F.3d 129 (3rd Cir. 2015) and *In re Nickelodeon Cons. Priv. Litig.*, 827 F.3d 262 (3rd Cir. 2016). Regarding both the Google and Nickelodeon

---

absolute right of privacy in a party's office or place of business.").

[18] Facebook was collecting information "from the seven million websites . . ." *Id.* at 603.

cases, the Ninth Circuit noted, "the critical fact was that the online entity represented to the plaintiffs that their information would not be collected, but then proceeded to collect it anyway." *In re Facebook*, 956 F.3d at 603.

Again, Holden does not and cannot allege that she had any reasonable expectation of privacy while browsing the Website given the ubiquity of the use analytics and tracking technology (both this Court's own website and Holden's Counsel's website[19] appear to use Google Analytics which does not include session replay, but does track page views, one of the items Holden alleges was improperly tracked by NLL). Unlike the plaintiffs in *Facebook*, *Google* and *Nickelodeon*, Holden does not allege NLL somehow created a reasonable expectation of privacy by misrepresenting whether any tracking would occur, a suggestion that would require a complete disregard of the Privacy Policy, Cookie Banner, Privacy Settings, and Terms of Use.

### F.   Holden Does Not Allege NLL Used a "Device" to Acquire Contents of any Communication.

FSCA's definition of "intercept" requires the contents of a communication to be acquired "through the use of any electronic, mechanical, or other device". Fla. Stat. § 934.02(3).[20] The plain meaning of the word "device" does not include software. Although the word "device" itself is not defined in FSCA, Webster's Dictionary defines "device" as "a piece of equipment or a mechanism designed to

---

[19] www.sflinjuryattorneys.com and www.flmd.uscourts.gov/ (last visited Mar. 30, 2021).
[20] "Electronic, mechanical, or other device" is defined by FSCA as "any device or apparatus which can be used to intercept a wire, electronic, or oral communication . . ." Fla. Stat. § 934.02(4).

serve a special purpose or perform a special function." *See Consolidation Coal v. Fed. Mine Safety & Health Review Comm'n*, 136 F.3d 819, 822 n. 5 (D.C. Cir. 1998) citing *Webster's Third New International Dictionary Unabridged* 618 (2002); *see also Device*, Black's Law Dictionary (11th ed. 2019) (a 'device' is a "mechanical invention, as differentiated in patent law from a chemical discovery").[21] The FSCA definition of electronic, mechanical, or other device —and particularly, its references to "equipment" or "a mechanism"—connotes a physical object. The term "device" is also used throughout FSCA in ways that clearly reference a physical object.[22]

The plain meaning of the word "device" together with the context afforded by the terms used throughout FSCA makes clear that it does not apply to a website's code. *See Potter v. Havlicek*, 2008 WL 2556723 at *9 (S.D.Ohio 2008) (finding the term "device" did not encompass the software at issue and "no court has applied [the Federal Wiretap Act] to a computer software program").[23] The Florida Legislature never amended FSCA to extend "device" beyond its original meaning of physical objects designed to intercept communications.[24] Had the legislature intended to

---

[21] An "apparatus" is defined as a "machine," which "consist[s] of fixed and moving parts that work together to perform some function." *Apparatus*, Black's Law Dictionary (11th ed. 2019); *Machine*, Black's Law Dictionary (11th ed. 2019).

[22] *See, e.g.* Fla Stat. § 934.04 concerning the "manufacture, distribution, or possession" of devices, the "assembl[y]" of devices, and the sending of devices through the mail or carrying devices "in intrastate, interstate, or foreign commerce"; § 934.05 concerning confiscation and seizure of devices.

[23] *See also Dep't of Highway Safety & Motor Vehicles v. Berne*, 49 So. 3d 779, 783 (Fla. 5th DCA 2010) (explaining that software is something that is installed on a "device"); *United States v. Szymuszkiewicz*, 622 F.3d 701, 707 (7th Cir. 2010), *as amended* (Nov. 29, 2010) (identifying three physical devices used in the interception of an e-mail, none of which consisted of software).

[24] In contrast, FSCA expressly excludes from the definition of "electronic communication": "[a]ny communication from an electronic or mechanical device which permits the tracking of the movement of a person or an object." Fla. Stat. § 934.02(12)(c). A mouse is exactly such a device, permitting a user's physical movements to be tracked electronically (a person), as well as the cursor

define the word "device" in FSCA to include software it could have done so as it has in other contexts. *See* Fla. Stat. § 812.15 (specifically defining "communications device" to include, among other things, "software").

The fact that a statute has "broad privacy protection goals" does not provide a basis for application of a definition beyond the plain meaning of a term in that statute. *See Duguid*, 2021 WL 1215717 at *7. A court must interpret a statute as written even in light of changes in technology. *Id.*

### G.   FSCA is a Criminal Statute that must be Interpreted Narrowly.

FSCA is a criminal statute with violations punishable as third-degree felonies. *See* Fla. Stat. 934.03(4)(a). When a criminal statute is interpreted, "it is appropriate to apply the rule of lenity in resolving any ambiguity in the ambit of the statute's coverage," even in a civil case. *Crandon v. United States*, 494 U.S. 152, 158 (1990); *see also North Carillon v. CRC 603,* 135 So.3d 274 (Fla. 2014) (affirming dismissal of civil action because rule of lenity required criminal statute to be construed most favorably for the defendant). "[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *U.S. v. Lanier*, 520 U.S. 259, 266 (1997). Therefore, the rule of lenity prohibits expanding the scope of FSCA without clear legislative intent.

As set forth above, Holden's claim is predicated upon a novel, extremely

---

on the screen and the mouse itself (objects).

aggressive, and incorrect interpretation of FSCA that has never been accepted by a court.[25] This result would be unfair and unjust as FSCA has never been applied to the types of conduct Holden alleges. Instead, FSCA has always been limited to the contents of communications in the traditional sense—words spoken or transcribed. The Florida Legislature adapted this statute to protect these same types of communications transmitted in a new way, electronically.

## VI.   CONCLUSION

For all of these reasons, NLL's Motion should be granted and the Complaint should be dismissed with prejudice.

McGLINCHEY STAFFORD

/s/ Joseph A. Apatov
JOSEPH A. APATOV (Fl. Bar No. 93546)        ANTHONY J. ROLLO
PETER J. MASKOW (Fl. Bar No. 91541)         Florida Bar No. 1021179
1 E. Broward Blvd, Suite 1400               301 Main Street, Suite 1400
Fort Lauderdale, Florida 33301              Baton Rouge, LA 70801-1919
Tel: (954) 356-2516                         Tel: (225) 382-3685
Fax: (954) 252-3808                         Fax: (225) 570-4625
Primary E-Mail: japatov@mcglinchey.com      Email: arollo@mcglinchey.com
                pmaskow@mcglinchey.com
Counsel for NortonLifeLock LLC

## CERTIFICATE OF SERVICE

I certify that on April 20, 2021, a true and accurate copy of this Motion has been filed using CM/ECF, causing a copy to be served on all parties.

/s/ Joseph A. Apatov
Joseph A. Apatov, Esq.

---

[25] In fact, Judge Steele of this Court has held that in order to violate FSCA there must be an improper disclosure of the recorded communication. *See Harris v. Jan*, 2018 WL 4898831, at *2 (M.D. Fla. 2018). Holden does not allege any such improper disclosure.