UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

LAUREN HOLDEN, individually and
on behalf of all others similarly situated,

                                          Case No. 3:21-cv-000279-BJD-JRK

     Plaintiff,

v.

NORTONLIFELOCK INC.,

     Defendant.

_____/

## DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

Pursuant to Rule 12(b)(6), defendant NortonLifeLock Inc. ("NLL") moves for dismissal of the First Amended Class Action Complaint ("FAC") filed by Plaintiff, Lauren Holden ("Holden").

Holden's suit seeks to transform the ordinary use of common commercial website analytics tools called "session replay" into criminal behavior by misapplying a wiretapping statute enacted for a different purpose. Holden's goal in this and in three other identical class actions pending before this Court[1] is to recover millions in statutory penalties on behalf of herself and classes that could never be certified.

"Session replay" generally describes an analytics tool that tracks a user's movements and clicks solely while on that website to improve the visitor's

---

[1] Including Holden's own four cases, to date Holden's Counsel has filed 44 identical class actions related to alleged use of session replay on business websites in violation of FSCA, almost all of which have resulted in amended pleadings, and several copycat class action lawsuits have been filed.

experiences and interactions. Holden claims NLL's use of session replay technology on us.norton.com (the "Website") constituted an invasion of her privacy and Florida Security of Communications Act, Fla. Stat. § 934.01, *et seq.* ("FSCA") violation. Enacted in 1969, FSCA is aimed at prohibiting the improper recordings of oral or wire[2] communications used in furtherance of criminal activity. Fla. Stat. § 934.01. It is not intended to create a cause of action against an internet website operator for using industry standard session replay technology to understand and improve its own site's functionality and user's experience.

Significantly, the session replay tool has been used by website operators for many years, but has **never** been found to violate any state or federal wiretapping statute, including FSCA. Holden is trying to jam a square peg into a round hole, as the use of session replay is outside FSCA's scope, defined terms, and intended purpose as a matter of law. Every court that has addressed the purpose and scope of FSCA has reached this conclusion and dismissed the respective actions.[3]

Moreover, NLL's Privacy Policy repeatedly disclosed to Holden that it uses "tracking" technologies and its Cookie Banner not only disclosed the use of "tracking" technologies, but also gave Holden the option to globally turn off

---

[2] Wire communications were only protected insofar as the contents of the communications could be "heard and understood by the human ear. *See* Staff Analysis 88-184 at 1 (attached as Exhibit A).

[3] *See Jacome v. Spirit Airlines*, 2021 WL 3087860 (Fla. 11th Cir. Ct. June 17, 2021); *Connor v. Whirlpool*, 2021 WL 3076477 (S.D. Fla. July 6, 2021); *Cardoso v. Whirlpool*, 2021 WL 2820822 (S.D. Fla. July 6, 2021); *Swiggum v. EAN Services, LLC,* 2021 WL 3022735 (M.D. Fla. July 16, 2021). NLL acknowledges that one Manatee County Judge and one Central District of California Judge have allowed FSCA claims to survive beyond the pleading stage, but neither addressed the purpose or scope of FSCA. Both cases will be discussed below.

cookies. Through her use of the Website, Holden affirmatively consented to the Website's Terms of Use including the use of the tracking software.

## I.  MATERIAL ALLEGATIONS IN THE FIRST AMENDED COMPLAINT

Holden alleges she visited the Website approximately twenty times within one year prior to filing the FAC, with the last visit being in December 2020, and that during "one or more of these visits," NLL used "session replay" software to contemporaneously intercept her interaction with the Website, including "mouse clicks and movements, keystrokes, search terms, information inputted by Plaintiff, pages and content viewed by Plaintiff, and scroll movements, and copy and paste actions."[4] Holden then states in conclusory fashion that these interactions constitute the "substance, purport, and/or meaning" of her communications with the Website. *Id.* at ¶ 42. Noticeably **missing** from the FAC are any facts alleging what she actually did on NLL's Website during any of her twenty visits, including how browsing a website constituted a "communication;" what, if any, alleged communications NLL actually intercepted; or what NLL is supposed to have done with any allegedly intercepted communications. Holden claims she never consented to the "interception of her electronic communications," and Holden avers NLL "did not disclose its interception nor seek consent from [Holden] prior

---

[4] Doc. 39 at ¶¶ 37, 42. These alleged actions are referred to collectively as "Website Tracking" throughout this Motion. The list is similar or identical to the language used in each of the class actions where Holden is a plaintiff, as well as the other matching class actions filed by Holden's Counsel. Holden does not allege what substance or meaning she conveyed through these interactions. As a result, Holden provides no insight into this crucial allegation to her claim.

to interception of [her] communications." *Id*. at ¶¶ 50-55.

These allegations are insufficient to state a claim. Moreover, this deficiency has been briefed *repeatedly* in this action, and Holden should not be permitted a third opportunity to correct this glaring deficiency.

## II.   STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint cannot rest on "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," and "[t]he mere possibility the defendant acted unlawfully is insufficient to survive" this standard. *See Sinaltrainal v. Coca-Cola*, 578 F.3d 1252, 1261 (11th Cir. 2009). This Court "may consider a document attached to a motion to dismiss . . . if the attached document is (1) central to the plaintiffs claim and (2) undisputed. In this context, `undisputed' means that the authenticity of the document is not challenged." *Day v. Taylor*, 400 F. 3d 1272, 1276 (11th Cir. 2005).[5]

## III.   SUMMARY OF ARGUMENT

Rather than alleging facts sufficient to state a claim, Holden  instead relies upon labels and conclusions, formulaically reciting the elements of a FSCA claim. Notably, Holden does not allege what information she transmitted to the Website that could

---

[5] In addition, this Court can take judicial notice of the contents of historical webpages, including terms of use and privacy policies. *See, e.g., Capua v. Air Europa Lineas Aereas S.A. Inc.*, 20-CV-61438-RAR, 2021 WL 965500 at *2 (S.D. Fla. Mar. 15, 2021); *see also infra* at n. 14.

have been intercepted. This is fatal to the FAC because FSCA requires the "contents" of a communication - the intended substance or meaning of a communication - to be intercepted for a violation to occur.

Instead, Holden seeks to apply FSCA to conduct that falls outside of its scope. FSCA protects the contents of communications from interception, such as the words spoken on a telephone call. It does not protect against a website provider monitoring non-content record activity on its own website, and no court has ever found otherwise. In addition, Holden also fails to allege that any communication was intercepted "contemporaneously" with its transmission or that NLL used a "device" to intercept her communications. Without alleging facts demonstrating that any communications were "intercepted" at the same time as transmission rather than at some later point in time, and without alleging that a physical object designed for intercepting communications was utilized to "intercept" her communications, Holden's claim fails.

Even if Holden could use a third bite at the apple to overcome these pleading deficiencies, her claim still fails because NLL disclosed that it may track such information, and Holden consented to that tracking. Holden did not have a reasonable expectation of privacy during her visits to NLL's Website to begin with, but the disclosures and Holden's consent eliminate the possibility of such an expectation.

Holden's assertion that Website Tracking falls within the scope of FSCA should be rejected. FSCA is a criminal statute, so the applicable rule of lenity requires the statute to be construed narrowly and in favor of NLL, the defendant.

IV.   **ARGUMENT**

   **A. FSCA was not Designed to Address Website Tracking.**

   FSCA does not criminalize tracking Holden's alleged activities on the Website. Courts that have considered this question have universally held that FSCA does not apply to "session replay" software and dismissed class action complaints substantively the same as Holden's FAC. *See Jacome*, 2021 WL 3087860 ("FSCA does *not* cover Plaintiff's claims seeking to penalize Spirit's use of session replay software on its Website") (emphasis in original); *Connor ,* 2021 WL 3076477 ("the Court has ruled that the FSCA does not apply to the plaintiff's claims regarding session replay technology software on a commercial website"); *Cardoso,* 2021 WL 2820822 (same); *Swiggum,* 2021 WL 3022735 ("the Court . . . concludes that the FSCA does not apply to Plaintiff's claims regarding session replay software on a commercial website").[6]

   In order to try and avoid this inescapable conclusion, Holden cherry-picks out of context legislative history from the Federal Wiretap Act and a single sentence from the Florida legislature to try to validate her argument and distract the Court from the

---

[6] Judge Lopez issued *Jacome*, Judge Dimitrouleas issued *Cardoso* and *Connor*, and Judge Barber issued *Swiggum*. Several other Courts have stayed discovery in similar FSCA "session replay" class actions based upon a preliminary peak at the pending dispositive motion. *See, e.g. Smart v. Home Depot*, No. 5:21-cv-153 (M.D. Fla. June 3, 2021) (Moody, J.) (the "motion [to dismiss] raises serious questions about the viability of Plaintiff's FSCA claim."); *Zarnesky v. Adidas Am.*, No. 6:21-cv-540 (M.D. Fla. June 10, 2021) ("Plaintiff's [FSCA] claim is unlike any the Court has seen before. The motion to dismiss appears to have serious merit.") (Smith, Mag. J.). NLL acknowledges two orders have been entered allowing FSCA "session replay" claims to survive beyond the pleading stage, one in Manatee County, Florida and the other in the Central District of California, but neither Court addressed the purpose or scope of FSCA. *See* Docs. 29 and 34-1. NLL disagrees with the two orders which are in many ways limited by the arguments advanced by the defendants and contends that this Court should follow the reasoning of Judges Barber, Dimitrouleas, and Lopez.

purpose of the statute.[7] However, even Holden's cherry-picked history fails to support her contention that the 1988 amendment to FSCA was designed to dramatically expand the scope of the statute beyond traditional types of protected communications and somehow treat the transfer of data as sacrosanct, affording it greater protection than oral or wire communications.

The stated objective of FSCA is to protect substantive communications of "innocent persons" from government interception when a reasonable expectation of the privacy exists, and to provide a mechanism for law enforcement to obtain judicial authorization before intercepting private communications in criminal investigations. *See* Fla. Stat. §§ 934.01, 934.07.[8] Enactment of the 1968 Federal Wiretap Act, upon which FSCA is modeled, was in response to *Katz v. United States*, 389 U.S. 347, 353 (1967) wherein the Supreme Court held that "[t]he Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth, and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment."[9] Enactment of FSCA shortly thereafter accomplished the same objective on the state level.[10]

---

[7] *See, e.g.*, Doc. 39 at ¶¶ 3-6.

[8] *See also Jacome*, 2021 WL 3087860 at 2 ("FSCA was promulgated to: (1) protect the privacy of wire an oral communications, (2) prevent organized criminals from using oral and/or wire communications in their criminal activities, and (3) ensure than any information from such oral and wire communications would not be misused.").

[9] Sen. Rep. No. 99-541, at 1 (1986) ("Congress responded in a comprehensive fashion by authorizing Government interception, under carefully subscribed circumstances in title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. 2510 et seq.") (the "Senate Report").

[10] In doing so, the Florida Legislature sought to track the Federal Wiretap Act's expansion to include "electronic communications" from two years prior. *See* Ex. B at 2. Development of the World Wide Web did not begin until the following year and was not made generally available until several years later. *See* https://www.britannica.com/topic/World-Wide-Web (last visited March 24, 2021). After

Holden now attempts to utilize the civil remedy provisions of FSCA to claim that the statute as amended in 1988 protects mouse movements and pages viewed on a website from being seen by that website's owner regardless of whether any reasonable expectation of privacy exists or any substance is communicated. FSCA was amended in 1988 to include electronic communications in order to "extend the protection provided oral communications to communications using new technologies."[11] The legislative history relating to this addition identifies "cellular phones, voice mail, and computer-to-computer data transfer" as examples of electronic communications. *Id.* This context makes clear that while FSCA was designed to extend protections afforded to oral communications into the modern age, it was not amended to alter the type of communications that were protected, but only to adapt to new methods of delivery.[12] The federal legislative history leads to the same conclusion:

> A letter sent by first class mail is afforded a high level of protection against unauthorized opening . . . [and] [v]oice communications transmitted via common carrier are protected . . . [b]ut there are no comparable Federal statutory standard to protect the privacy and security of communications transmitted by new noncommon carrier communications services or new forms of telecommunications and computer technology.[13]

---

the World Wide Web was developed and released, FSCA was amended in 1997, 1999, 2000, 2002, 2010, 2013, and 2015, but none of these amendments expanded the limited scope of FSCA to reach Website Tracking. *See generally* Fla. Stat. § 934.01, *et. seq.* Moreover, the legislative findings were not updated when "electronic communications" was added to FSCA. *See* Fla. Stat. 934.01.

[11] *See* Staff Analysis 88-184 at 1 (attached as Exhibit A); *see also* Doc. 15 at 4.

[12] It is the content—the substance or meaning—of a communication imbued with a privacy expectation that FSCA was designed to protect, not the simple existence of sound or data in a communication. In fact, the Florida Legislature excluded 'tone-only' beepers from protection, but included protection for voice pagers and digital readout pagers. *See* Fla. Stat. 934.02(12)(b); Ex. A at 2. The legislative history explains "[t]hese forms of communications would be excluded primarily because of the limited privacy implications related to their use." *Id.*

[13] S. Rep. 99-541, 1986 WL 31929 at *2-5 (1986). *See also* 132 Cong. Rec. H4039-01, 1986 WL 776505 (1986) (explaining the amendment was needed to (1) ensure developments in technology do not cause communications to lose their privacy protection; (2) protect the communication itself regardless of the method of delivery; and (3) protect the contents of documents traditionally maintained on paper and protected from search and seizure).

As reflected in the Senate Report, Congress was concerned with codifying protection under the Fourth Amendment for electronic communications where a reasonable expectation of privacy exists akin to the expectation of privacy in already protected oral and wire communications. *See, e.g. id.* at *4, 13. However, Holden's position essentially requires this Court to conclude that mere reference to "computer-to-computer data transfer" in the legislative history was meant to show legislative intent to make a monumental change in the scope of FSCA -- that the addition of "electronic communications" to FSCA was meant to encompass every data transfer, not just data transfers in the nature of traditionally protected communications.[14]

The Court need only look to the Senate Report to reject this interpretation. The Glossary in the Senate Report describes "Computer-to-Computer Communications" to include "the transmission of financial records or funds transfers among financial institutions, medical records between hospitals and/or physicians' offices, and the transmission of proprietary data among the various offices of a company." S. Rep. 99-541, 1986 WL 31929 at *8. Each of the types of communications referenced is highly confidential in nature and carries a universally accepted expectation of privacy. *See also Jacome,* 2021 WL 3087860 at 2 (analyzing legislative history of the amendment and finding the purpose "was to protect private personal and business records (like

---

[14] Holden's broad interpretation of this limited expansion of FSCA is similar to an issue faced by the Supreme Court. *See Facebook v Duguid*, 141 S.Ct. 1163 (2021). There, Congress was concerned with preventing certain types of phone calls made using unique equipment, but the plaintiff unsuccessfully sought to interpret the definition far more expansively, capturing ubiquitous technology. *Id.* at *6 ("[e]xpanding the definition . . . would take a chainsaw to these nuanced problems when Congress meant to use a scalpel."). Here, Holden seeks to extend FSCA to outlaw technology ubiquitous in modern websites that have no relationship to the nuanced issues FSCA was designed to address.

medical records) from interception on computerized recordkeeping systems").

Holden attempts to state a claim in her FAC by contending not only that FSCA protects non-content transmissions such as voluntary mouse movements, but also that these protections are afforded regardless of any expectation of privacy. This leaves Holden's argument inconsistent at best and disingenuous at worst.[15]

The use of "computer-to-computer data transfer" in a legislative report cannot and does not reflect an intent to change the nature of the statute. Even after attempting to elaborate in the FAC on what activities she undertook on the Website[16] the FAC still does not describe electronic communications protected by FSCA, the interception of which would subject NLL to criminal and civil liability. Therefore, this Court should follow the well-reasoned decisions of Judges Barber, Dimitrouleas, and Lopez, hold FSCA does not apply to the NLL's alleged conduct, and dismiss Holden's FAC.

## B. "Session Replay" is not a "Device" under FSCA.

A FSCA violation requires an interception "through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3).[17] Holden alleges interception through the use of software, not an electronic or mechanical device. *See* Doc. 39 at ¶ 38. However, FSCA lacks any indication that software can be a "device."

---

[15] In seeking leave to file the FAC, Holden confirmed that FSCA was amended to "extend" the protections of oral communications to electronic communications, but then asserts that "FSCA only requires an expectation of privacy for 'oral communications'" and that "[e]lectronic communications under the FSCA have no similar expectation of privacy." Doc. 15 at 20.

[16] Doc. 39 at ¶ 28 ("mouse clicks and movements, keystrokes, search terms, information inputted by Plaintiff, pages and content viewed by Plaintiff, scroll movements, and copy and paste actions").

[17] "Electronic, mechanical, or other device" is defined by FSCA as "any device or apparatus which can be used to intercept a wire, electronic, or oral communication . . ." Fla. Stat. § 934.02(4).

"[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Gil v. Winn-Dixie Stores,* 993 F.3d 1266, 1276 (11th Cir. 2021).[18] "In order to determine the common usage or ordinary meaning of a term, courts often turn to dictionary definitions for guidance."[19]

Webster's Dictionary defines "device" as "a piece of equipment or a mechanism designed to serve a special purpose or perform a special function."[20] The definitions of device—and particularly, the references to "a mechanism" and "mechanical"—connote a physical object.[21] The term "device" is used throughout FSCA in ways that clearly reference a physical object.[22]

Despite the obvious meaning of the word device, Holden boldly states in her FAC that: "courts unanimously hold that software constitutes a 'device' for purposes of applying wiretap statutes." Doc. 15-1 at ¶ 87. However, none of the cases cited by

---

[18] Quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992); *see also Villarreal v. R.J. Reynolds Tobacco*, 839 F.3d 958, 969 (11th Cir. 2016) ("When the words of a statute are unambiguous . . . [our] 'judicial inquiry is complete.'") quoting Conn. Nat'l Bank, 503 U.S. at 254.

[19] *CBS v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001).

[20] *See Consolidation Coal v. Fed. Mine Safety & Health Review Comm'n*, 136 F.3d 819, 822 n. 5 (D.C. Cir. 1998) citing *Webster's Third New International Dictionary Unabridged* 618 (2002); *see also Device*, Black's Law Dictionary (11th ed. 2019) (a 'device' is a "mechanical invention, as differentiated in patent law from a chemical discovery"). An "apparatus" is defined as a "machine," which "consist[s] of fixed and moving parts that work together to perform some function." *Apparatus*, Black's Law Dictionary (11th ed. 2019); *Machine*, Black's Law Dictionary (11th ed. 2019).

[21] *See also Dep't of H'wy Safety v. Berne*, 49 So. 3d 779, 783 (Fla. 5th DCA 2010) (software is something that is installed on a "device"); *U.S. v. Szymuszkiewicz*, 622 F.3d 701, 707 (7th Cir. 2010) (identifying three physical devices used in the interception of an e-mail, none of which was software).

[22] *See, e.g.,* Fla Stat. § 934.04 concerning the "manufacture, distribution, or possession" of devices, the "assembl[y]" of devices, and the sending of devices through the mail or carrying devices "in intrastate, interstate, or foreign commerce"; § 934.05 concerning confiscation and seizure of devices.

Holden contains such a holding, nor even addresses the meaning of the word "device." One of the cases does not even use the word "device" anywhere in the decision. *See Klumb v. Goan*, 884 F.Supp.2d 644 (E.D. Tenn. 2012).[23]

In fact, software has been found **not** to be a device in this specific context. *See Potter v. Havlicek*, 2008 WL 2556723 at *9 (S.D. Ohio 2008) (finding "no court has applied [the Federal Wiretap Act] to a computer software program" and that software is not a "device or apparatus which can be used to intercept a wire, oral or electronic communication . . ."); *see also Jacome*, 2021 WL 3087860 at 5 (explaining that "other courts have held that software, email servers, and drives to not constitute devices under the wiretapping statutes."). In his order that was adopted by Judges Barber and Dimitrouleas, Judge Lopez encountered identical allegations to those in the FAC[24] and ruled that "Plaintiff fails to allege in the first instance that the session replay software at-issue is a 'device or apparatus which can be used to intercept a wire, electronic, or oral communication' and thus the Amended Complaint must be dismissed on this separate pleading failure." *Jacome*, 2021 WL 3087860 at 5.

If the words used by the legislature are clear but are not what the legislature intended, it is up to the legislature, not the courts, to correct them. *See Gil*, 993 F.3d at 1276, n. 12. "[O]ur constitutional structure does not permit this Court to 'rewrite the statute that Congress has enacted.'" *Puerto Rico v. Franklin Cal. Tax-Free Tr.*,

---

[23] The Court was considering whether the rerouting of emails was sufficiently contemporaneous to qualify as an interception, not whether software qualified as a "device". *See id.*
[24] Compare *Jacome*, 2021 WL 3087860 at 1, 4, 7 with Doc. 39 at ¶ 87.

136 S. Ct. 1938, 1949 (2016) quoting *Dodd v. United States*, 545 U.S. 353, 359 (2005).

This is especially true here where the Florida Legislature has demonstrated awareness that software falls outside the plain meaning of the word "device," taking steps to expressly expand the definition of "device" in another statute to include software. *See* Fla. Stat. § 812.15.[25] The clear meaning of "device" does not include software and that is where the inquiry ends. Therefore, this Court should dismiss Holden's FAC as she has not alleged that NLL utilized a "device."

### C. The FAC Still does not Allege any "Contents" that were allegedly Intercepted.

Holden contends NLL violated FSCA §§ 934.03(1)(a) and (1)(d), but to state a claim, these sections require Holden to allege that NLL **intercepted** her electronic communications and then **used the contents** of those communications. FSCA defines the term "intercept" as "the aural or other acquisition of the **contents** of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. §934.02(3) (emphasis added). "Contents," is defined as "any information concerning the **substance, purport, or meaning of that communication**." Fla. Stat. §934.02(7) (emphasis added).[26] However, Holden alleges only generic interactions with the Website and fails to show how any of these interactions are communications with "content" protected under FSCA.[27]

---

[25] Defining "Communications device" to mean: "any type of electronic mechanism . . . instrument, device, machine, equipment, or **software** that is capable of intercepting . . . any communications service, or any part, accessory, or component thereof, including . . . **software** . . ." (emphasis added).
[26] The Federal Wiretap Act defines "intercept" and "contents" identically. *See* 18 U.S.C. § 2510(4) and (8).
[27] Based upon Holden's Motion for Leave to Amend, it appears her position is that it is premature for the Court to consider this central element of her claim and that she will need discovery to be able to

The Ninth Circuit's explanation regarding the proper scope of the term "contents" under the Federal Wiretap Act in *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1107 (9th Cir. 2014) guides the result under FSCA.[28] There, the court considered the "ordinary meaning" of the terms in the definition of "contents" and found that "a dictionary in wide circulation during the relevant time frame provides the following definitions: (1) 'substance' means 'the characteristic and essential part,' (2) 'purport' means the meaning conveyed, professed or implied,' and (3) 'meaning' refers to 'the thing one intends to convey by language.'" *Id.* at 1105-06. The court concluded that "Congress intended the word 'contents' to mean a person's intended message to another (i.e. the 'essential part' of the communication, the 'meaning conveyed,' and the 'thing one intends to convey')." *Id.* at 1106. The court further found the "language and design of the statute as a whole" made clear that "the term 'contents' refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message . . ." *Id.*

Rather than plead what she sought to communicate by her own interactions with the Website, Holden's FAC includes screen shots from an unknown source reflecting what a generic visitor may have done through a visit to an unknown website

---

tell NLL and the Court what it is she herself communicated. *See* Doc. 15 at 5-8. This argument, if made again, is predicated upon wholly misapplied case law and legal principles. *See* Doc. 21 at 11-13.

[28] *See, e.g. O'Brien*, 899 So. 2d at 1135; *Royal Health Care Services v. Jefferson-Pilot Life Ins.*, 924 F.2d 215, 219 (11th Cir. 1991) (rejecting argument that "case law dealing with the Federal Wiretap Act is inapposite," in light of identity of language used and historical note to the legislative findings section of FSCA); *Horn v. State*, 298 So. 2d 194, 198 (Fla. 1st DCA 1974) (construing "virtually identical" federal statute); *Stalley v. ADS All. Data Sys.*, 997 F. Supp. 2d 1259, 1270 (M.D. Fla. 2014), *aff'd sub nom. Stalley v. ADS All. Data Sys.*, 602 Fed. Appx. 732 (11th Cir. 2015) (analyzing federal cases where parties agreed that "FSCA mirrors the Federal Wiretap Act").

unrelated to NLL. Doc. 39 at ¶ 12. These images provide no insight whatsoever as to the content of any activities Holden herself might have conducted on the Website.[29]

Federal courts uniformly find non-content record information, such as email addresses, URLs and IP addresses, geolocation data, passwords and user IDs, and other basic identification and address information, are not "contents" of an electronic communication within the Federal Wiretap Act's purview. *See, e.g., Zynga.* at 1107.[30] This is so because: "[u[nder the Fourth Amendment, courts have long distinguished between the contents of a communication (in which a person may have a reasonable expectation of privacy) and record information about those communications (in which a person does not have a reasonable expectation of privacy)." *Id.* at 1108.

The common theme as applied by the courts and explained by Congress and the Florida Legislature in connection with the amendment of the Federal Wiretap Act and FSCA to include electronic communication is that only the content of a communication, be it oral, wire or data transfer is protected to the extent the content is of a nature where there is a reasonable expectation of privacy. In order to state a plausible claim, Holden was required to plead the specific content of alleged

---

[29] For example, these screen shots include such information as "John Doe's" height and weight, social security number, date of birth, credit card number and blood type. Holden does not allege that she input anything similar to the Website. The screen shots include squiggly lines which appear like something a child would do on an Etch-A-Sketch toy. If these are intended to reflect the nature of Holden's mouse movements on the Website, there is a complete absence of pleading as to the substance, purport or meaning of the squiggly lines. Presumably, Holden feels no need to elaborate on the significance of these squiggly lines because she argues that if **any** electronic data transfer is intercepted, content and meaning is irrelevant and the intercepting party is guilty of a felony.

[30] *See also U.S. v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008); *U.S. v. Reed*, 575 F.3d 900, 917 (9th Cir. 2009); *Brodsky v. Apple*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020) ("user names, passwords, and geographic location information" is not "content[]"); *Gonzales v. Uber Techs.*, 305 F. Supp. 3d 1078, 1086 (N.D. Cal. 2018) ("simply opening a webpage . . . is not a communication with content.").

communications, the interception of which would violate FSCA.[31] Holden has failed to do so, again, instead relying upon a generic list of interactions devoid of content.

In fact, Judge Lopez recently found a generic list of interactions identical to those alleged by Holden[32] to be insufficient to state a claim, explaining:

> Plaintiff alleges that her "mouse clicks and movements, keystrokes, search terms, information inputted by Plaintiff, and pages and content viewed by Plaintiff" were intercepted . . . But the Court holds that is precisely the type of non-record information that courts consistently find do not constitute 'contents' under the Federal Wiretap Act or any of its state analogs because it does not convey the substance or meaning of any message. [Citations omitted]. The Court further finds this case to be directly analogous to *Minotty*, 42 So. 3d 824, because here, the Court holds that a silent video of Plaintiff's interactions with the Website is not actionable under the FSCA.

*Jacome*, 2021 WL 3087860 at 8; *see also Yoon v. Lululemon USA*, Case No. 5:20-cv-2439 (C.D. Cal. July 15, 2021) ("Yoon alleges that Quantum Metric recorded her 'keystrokes, mouse clicks, pages viewed, and shipping and billing information . . . [and] the date and time of the visit, the duration of the visit, Plaintiff's IP address, her location at the time of the visit, her browser type, and the operating system on her device.' None of these pieces of data constitute message content in the same way that the words of a text message or an email do.").

Here, Holden never alleges that she entered into the public Website any information or "content," and moving a mouse is not content.[33] Any facts alleged by Holden in this regard merely refer to non-content record activity. *See* Doc. 39 at ¶ 28.

---

[31] . *See, e.g., Jones*, 2018 WL 2316636 at *6 (generalized allegations of communications without describing those communications found insufficient to state a claim).

[32] Compare *Jacome*, 2021 WL 3087860 at 1, 4, 7 with Doc 39 at ¶ 28.

[33] Moving a mouse on a screen to navigate another's website is no more the "contents" of a communication than the act of driving a car is a communication to others that you are driving a car.

The FAC should therefore be dismissed because Holden has not alleged the interception of the "contents" of any communications.

### D.   NLL Disclosed, and Holden Consented to NLL's Use of Analytics and Website Tracking on the Website.

Through its multiple website disclosures, NLL expressly put Holden on notice of, and she consented to, any monitoring NLL allegedly conducted related to her repeated voluntary use of the Website.[34] *See, e.g., Jackson v. State*, 18 So. 3d 1016, 1030 (Fla. 2009). NLL gave Holden the right to opt out immediately upon visiting the Website. *See* Ex. D-1.[35] The Cookie Banner is prominent at the bottom of the Website homepage and remains so until the visitor either accepts the terms by clicking "Yes, I

---

[34] Courts in the Eleventh Circuit routinely consider website terms of use and privacy policies at the motion to dismiss stage. *See, e.g., Githieya v. Glob. Tel*Link*, 2016 WL 304534, at *3 (N.D. Ga. 2016). Here, Holden's FAC is replete with allegations regarding NLL's disclosures and terms of use, and they are therefore central to Holden's claim and appropriate for this Court's consideration. *See, e.g.* Doc 39 at ¶¶ 64-67; *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1054 n. 12 (11th Cir. 2015). Copies of the (1) Terms of Use (effective July 21, 2020), (2) Privacy Policy (effective January 1, 2020), (3) Cookie Banner and  Privacy Settings (effective September 24, 2020), (4)  Prior Terms of Use (effective February 8, 2020) and (5) the Prior Cookie Banner and Privacy Settings (effective February 8, 2020) (together, the Disclosures) are attached as Exhibits B, C, D-1 ("Cookie Banner") and D-2 ("Privacy Setting"), E, F-1, and F-2. These cover the period of Holden's alleges visits to the Website. *See* Doc. 39 at ¶¶ 11-12. The two versions of the Terms of Use as well as the two version of the Cookie Banner and Privacy Settings are materially the same. Compare Ex. B & D with Ex. E & F.

Separately and independently, this Court can consider NLL's Terms of Use and Privacy Policy by taking judicial notice of them. The copies of NLL's Terms of Use and Privacy Policy were obtained from Internet Archive's Wayback Machine, which maintains archived copies of historical webpages. The Cookie Banner in effect before September 24, 2020 was obtained from archive.today, another internet archive. Courts in the Eleventh Circuit have taken judicial notice of such records. *See, e.g., Capua*, 2021 WL 965500, at *2; *Tobinick v. Novella*, 2015 WL 1526196, at *2 (S.D. Fla. 2015); *Pohl v. MH Sub I, LLC*, 332 F.R.D. 713, 716 (N.D. Fla. 2019) (collecting cases).

[35] The Cookie Banner states: "[w]e and our partners use cookies on this site to improve the efficiency of the navigation, perform analytics, serve more relevant advertising . . ." along with options to select "Yes, I agree" or "No, take me to settings." Ex. D-1. The version of the Cookie Banner in effect through September 24, 2020 contained a similar statement: "We use cookies for personalization, analytics, security and advertising purposes. Learn more." Ex. F-1 at 1. That sentence was followed by a button "OK" which, if clicked, opened a screen that contained the same substance as the more recent Privacy Settings, with minor stylistic differences. Compare Ex. D-2 with Ex. F-2.

agree" or clicks "No, take me to settings." *See id.* By selecting "No, take me to settings," the user is then taken to the Privacy Settings where another disclosure appears, explaining "**we might sometimes track information about you . . .**" and the user is given the option to consent or opt out in whole or in part. *See* Ex. D-2.

Therefore, Holden would have either clicked "Yes" to accept the terms or "No" and then have been taken to the Privacy Settings where she had an opportunity to turn off some or all cookies which would allow her to turn off all tracking. *See* Ex. D. The Privacy Settings tab remains prominent in the bottom right of the screen during the entire website visit. *See, e.g., id.* The Privacy Policy is referenced in the Cookie Banner ("We've updated our privacy and cookie policy"). *Id.*

In the FAC Holden denies clicking to provide consent. *See* Doc. 39 at ¶ 56. So, she either continued viewing the Website without clicking "Yes" or "No", leaving the Cookie Banner prominent at the bottom of the screen as she continued browsing the Website each of the twenty times she visited, or she clicked "No" and was given the opportunity to turn off the tracking cookies. At any time, Holden was able to view the Privacy Policy referenced in the Cookie Banner and linked to on the Website.[36]

The Terms of Use agreed upon by Holden through her voluntary and continued

---

[36] Also, the Terms of Use which are available through a link on every page of the Website begins by stating that "[t]he following terms and conditions, together with any policies incorporated by reference [i.e. the Privacy Policy], govern your access and use of" the Website, and "[b]y accessing, or using this Website, you acknowledge that you have read, understand, and agree to be bound by these terms . . . **If you do not agree to these terms please do not use this Website.**" Ex. B at 1 (emphasis added).The Terms of Use in effect in effect during the relevant period prior to July 21, 2020 contained insignificant differences. *See* Ex. E at 1.

use of the Website also states under the heading **Confidential Information and Privacy:**

> . . . NortonLifeLock does not want to receive confidential or proprietary information from you through our Website. . . . any information or material sent to NortonLifeLock will be deemed NOT CONFIDENTIAL. By sending NortonLifeLock any information or material, you hereby grant [NLL] an unrestricted, irrevocable license to copy, reproduce, publish, upload, post, transmit, distribute, publicly display, perform, modify, create derivative works from, and otherwise freely use, those materials or information. . . . Personally-identifiable information . . . will be handled in accordance with our privacy policies. Please see the Privacy section on this Website for information regarding NortonLifeLock's privacy policies.[37]

The Website also disclosed to Holden that use of the Website would be tracked and her data would be collected unless she opted out of the tracking and collection by way of a conspicuous link to the agreed upon Privacy Policy that is available from the front page of the Website and every sub-page, as well as in the Terms of Use where it is referenced. Below are excerpts from the Privacy Policy:[38]

- The first page of the Privacy Policy explains that it "**describes how we collect, process and share personal data and the choices available to you regarding collection and use of your personal data.**" Ex. C at 1.

- The introduction is followed by an outline of the Policy with headings including "**Cookies and tracking technologies**"; "**How we collect personal data**" and "**The categories of personal data we collect**", along with statements such as "**We use cookies and similar tracking technologies on our websites . . .**" *Id.* at 1-5.

- In the "Global Privacy Statement" under the all-capital bolded and underlined heading "**HOW WE COLLECT YOUR PERSONAL DATA AND FROM WHAT SOURCES**" the following disclosures, among others, are made:

  o "When you visit and use our websites, products and services, we automatically may collect data about your use of our websites, products and services; When you interact directly with us, we may collect personal data that you provide to us (e.g. account and payment information)."

---

[37] Ex. B at 5. The prior version references Symantec and does not capitalize "website". *See* Ex. E at 2.
[38] All emphasis is supplied unless otherwise noted.

- o "The categories of personal data that we collect . . . include: . . . device and system information, browser type, IP address, type of operating system, and internet or other electronic network activity information . . . data received directly from you, and/or derived from cookies . . . and third-parties indicating usage and preferences . . ." *Id.* at 6-7.

- Then, under the all-capital bolded and underlined heading "**COOKIES & TRACKING TECHNOLOGIES**", the following disclosures are made:
-
  - o We and our partners use cookies and other similar **tracking technologies** . . . on our websites or emails to . . .

  - o We use different kinds of cookies: . . . **Advertising cookies and tracking scripts** are used to make advertising messages more relevant to you. . .

  - o If you do not wish to receive cookies you may be able to refuse them by not agreeing to the use of them upon entering the website. *Id.* at 15-16.

Despite these robust and prominent Disclosures, in Holden's FAC she alleges that the use of "session replay" was not disclosed.[39] Yet, Holden repeatedly discusses the ability of "session replay" to "track" her website visits including the use of script in the tracking.[40] Using Holden's own words, session replay is a "tracking technology." Throughout the Disclosures it is clear that tracking technologies are used on the Website and those tracking technologies include the use of cookies and script. Contrary to Holden's assertion, the use of tracking technology of which Holden alleges session replay is a type, were clearly disclosed.

Because Holden does not allege that she chose to opt out nor disputed the Terms of Use, she consented to the tracking technology due to her continued use of the Website on each of her twenty visits. *See In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016,

---

[39] *See* Doc. 39 at ¶ 55.
[40] *See* Doc. 39 at ¶¶ 1, 10, 11, 13 15, 29, 31, 45, and 50.

1031 (N.D. Cal. 2014) (dismissing wiretapping claims where users consented to terms of service that put them on notice about analyzing emails for purposes of providing personal product features and targeted advertising).[41] Therefore, even if she could overcome the other deficiencies in the FAC, Holden consented to the use of tracking technologies of which session replay is a type. Therefore the FAC should be dismissed.

## E.   Holden did not have a reasonable expectation of privacy on the Website.

"Enactment of [FSCA] connotes a policy decision by the Florida legislature to allow each party to a conversation to have an expectation of privacy from interception by another party to the conversation." *O'Brien v. O'Brien*, 899 So. 2d 1133, 1135 (Fla. 5th DCA 2005) (citations and quotation marks omitted).

> This expectation of privacy does not contemplate merely a subjective expectation on the part of the person making the uttered oral communication but rather contemplates a reasonable expectation of privacy. A reasonable expectation of privacy under a given set of circumstances depends upon one's actual subjective expectation of privacy as well as whether society is prepared to recognize this expectation as reasonable.

*State v. Inciarrano*, 473 So. 2d 1272, 1275 (Fla. 1985).

However, Holden did not have a reasonable expectation of privacy while she voluntarily browsed NLL's Website. *See Jacome*, 2021 WL 3087860 at 7 ("there can be no reasonable expectation of privacy from a third-party website owner when Plaintiff voluntarily browses through that third-party's website").[42]

---

[41] *See also Dohrmann v. Intuit*, 823 Fed. Appx. 482, 483-84 (9th Cir. 2020); *Nguyen v. Barnes & Noble*, 763 F.3d 1171, 1177 (9th Cir. 2014) (a user can be bound by terms and conditions if "the website puts a reasonably prudent user on inquiry notice" of the same).

[42] *See Commonwealth v. Proetto*, 771 A.2d 823, 829 (Pa. Super. 2001) ("By the very act of sending a communication over the Internet, the party expressly consents to the recording of the message."); *Forrester*, 512 F.3d at 510–11 (holding computer surveillance techniques related to website visits and

In the unusual situations where courts have found an expectation of privacy to exist, the outcome was driven by highly narrow and unusual circumstances. These cases have involved companies affirmatively misleading their visitors about what data will be collected, failing to disclose the collection of highly sensitive data, and tracking users across all website interactions, not just the companies' own websites.[43]

Holden does not and cannot allege that she had any reasonable expectation of privacy while browsing the Website given the ubiquity of the use analytics and tracking technology.[44] Unlike the plaintiffs in *Facebook*, Holden does not allege NLL somehow created a reasonable expectation of privacy by misrepresenting whether any tracking would occur, a suggestion that would require a complete disregard of the Disclosures. Under identical circumstances,[45] Judge Lopez "found that Plaintiff must plead a reasonable expectation of privacy" and held "that Plaintiff's singular conclusory allegation" was insufficient. *Id.* at 7.

## F.   The FAC Mechanically Recites Elements Without Factual Allegations.

Like its predecessor, the FAC is almost entirely composed of labels,

---

e-mails not a "search" under the Fourth Amendment due to the lack of privacy expectation).

[43] *In re Facebook Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) involved Facebook tracking users on seven million websites even after the users logged out of Facebook's application, in order to create and sell personal profiles to advertisers. *Id.* at 596, 603.. The Court distinguished two other decisions finding an expectation of privacy: "the critical fact was that the online entity represented to the plaintiffs that their information would not be collected, but then proceeded to collect it anyway." *Id.*, 956 F.3d at 603; *see also Yoon* at 19.

[44] This Court's website and Holden's Counsel's website appear to use Google Analytics which does not include session replay, but does track page views, one of the items Holden alleges NLL improperly tracked. www.sflinjuryattorneys.com and www.flmd.uscourts.gov/ (last visited Mar. 30, 2021).

[45] Compare Doc. 39 at ¶ 91 with *Jacome*, Case No. 2021-947 (11th Cir. Ct. Mar. 17, 2021) at ¶ 72.

conclusions, and formulaic recitations of elements. For example, in order for an electronic communication to be intercepted, it must be acquired **contemporaneously** with transmission. *See U.S. v. Steiger*, 318 F.3d 1039, 1048–49 (11th Cir. 2003) ("[W]e hold that a contemporaneous interception—i.e., an acquisition during 'flight'—is required to implicate the Wiretap Act with respect to electronic communications."); *Jacome,* 2021 WL 3087860 at 6 (finding similar allegations to Holden's insufficient to "demonstrate that any interception happened contemporaneously with transmission as opposed to being retrieved from storage," and that surrounding allegations that are also present in the FAC "suggesting the latter to be the case."); *O'Brien*, 899 So. 2d at 1136.[46] Holden merely recites the word "contemporaneously" throughout the FAC, but provides no factual basis to support this label.[47]

Similarly, Holden fails to allege that any "Electronic communication" was intercepted as that term is defined by FSCA. In FSCA's definition of "electronic communication," "[a]ny communication from an electronic or mechanical device which permits the tracking of the movement of a person or an object" is specifically excepted. *Jacome*, 2021 WL 3087860 at 5. However, Holden seeks to hold NLL liable for intercepting communications from Holden's mouse and keyboard that

---

[46] *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113 (3d Cir. 2003), as amended (Jan. 20, 2004) ("Every circuit court to have considered the matter has held that an 'intercept' under the [Federal Wiretap Act] must occur contemporaneously with transmission."); *Handley v. Wilson*, 2010 WL 11607357 (S.D. Fla. 2010) ("Fla. Stat. § 934.10 does not provide a cause of action to those whose electronic communications were acquired from electronic storage rather than intercepted during contemporaneous transmission").

[47] *See, e.g.* Doc. 39 at ¶¶ 9, 37, 38; *Jacome,* 2021 WL 3087860 at 6.

demonstrate her movement on the Website. As Judge Lopez recently found, session-replay software "permits the tracking of the movement of . . . an object" and thus falls outside the definition of 'electronic communications' under the FSCA." *Id.*

Because Holden fails to allege facts that support the legal conclusions and formulaic recitation of elements, the FAC should be dismissed.

### G.    FSCA is a Criminal Statute that must be Interpreted Narrowly

FSCA is a criminal statute with violations punishable as third-degree felonies. *See* Fla. Stat. 934.03(4)(a). Interpreting a criminal statute, "it is appropriate to apply the rule of lenity in resolving any ambiguity in the ambit of the statute's coverage," even in a civil case.[48] Therefore, the rule of lenity prohibits expanding the scope of FSCA without clear legislative intent. *See Jacome*, 2021 WL 3087860 at 3 ("the rule of lenity demands that the Court interpret the FSCA in favor of" the defendant").

Holden's claim is predicated upon an extremely aggressive and incorrect interpretation of FSCA based upon an expanded construction of the statute that is precluded by the rule of lenity.[49]

### H.    Holden Should not be Permitted a Third Bite at the Apple

After extensive briefing and the significant passage of time, Holden should

---

[48] *Crandon v. U.S.*, 494 U.S. 152, 158 (1990); *see also North Carillon v. CRC 603,* 135 So. 3d 274 (Fla. 2014) (affirming dismissal of civil action because rule of lenity required criminal statute to be construed most favorably for the defendant). "[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *U.S. v. Lanier*, 520 U.S. 259, 266 (1997).

[49] In fact, Judge Steele of this Court has held that in order to violate FSCA there must be an improper disclosure of the recorded communication. *See Harris v. Jan*, 2018 WL 4898831, at *2 (M.D. Fla. 2018). Holden does not allege any such improper disclosure.

not be permitted a third bite at the apple. *See, e.g. Novoneuron v. Addiction Research Institute*, 326 Fed. Appx. 505, 507 (11th Cir. 2009) (finding dismissal with prejudice appropriate after only one amendment due to decision to respond to motion to dismiss rather than seek leave to further amend).[50] This is especially true since FSCA does not apply to her claims and amendment is futile, as Judges Barber, Dimitrouleas, and Lopez recognized.[51]

## V.   CONCLUSION

For all of these reasons, the FAC should be dismissed with prejudice.

## LOCAL RULE 3.01(g) CERTIFICATION

I certify that NLL conferred with counsel for Holden via e-mail on August 5, 2021, and Holden opposes the relief sought in this motion.

**McGLINCHEY STAFFORD**
*/s/ Joseph A. Apatov*
JOSEPH A. APATOV (Fl. Bar No. 93546)          ANTHONY J. ROLLO
PETER J. MASKOW (Fl. Bar No. 91541)          Florida Bar No. 1021179
1 E. Broward Blvd, Suite 1400                301 Main Street, Suite 1400
Fort Lauderdale, Florida 33301               Baton Rouge, LA 70801-1919
Tel: (954) 356-2516                          Tel: (225) 382-3685
Fax: (954) 252-3808                          Fax: (225) 570-4625
Primary E-Mail: japatov@mcglinchey.com       Email: arollo@mcglinchey.com
          pmaskow@mcglinchey.com     *Counsel for NortonLifeLock Inc.*

---

[50] *Ham v. Nationstar Mortg.*, 2017 WL 11002158 at *3 (M.D. Fla. 2017) ("A district court . . . is not required to permit amendment if, inter alia, 'there has been . . . repeated failure to cure deficiencies by amendments previously allowed' or 'amendment would be futile.'").

[51] Although each permitted leave to amend, those case arose in a different posture because the plaintiff in those cases each chose to exercise their option to amend as a matter of right early in the litigation, without briefing any dispositive motions or contested motion for leave. Therefore the issues in the case were considerably less developed. Moreover, in *Jacome* Judge Lopez dismissed the FSCA claim with prejudice, presumably only allowing leave to amend if a different claim could be alleged. In *Swiggum*, *Cardoso*, and *Connor*, Judges Barber and Dimitrouleas both stated that amendment appears to be futile but permitted leave to amend 'out of an abundance of caution,' with Judge Barber also qualifying that the amendment can only be made if it could be done "in good faith."